# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**NESTORA GARCIA,** *et al.***,**

      Plaintiffs,

                                                    Case No. 09-cv-322 BB/WDS

v.

**BOARD OF COUNTY COMMISSIONERS**
**OF THE COUNTY OF BERNALILLO,** *et al.***,**

      Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on a motion for summary judgment by Defendants Dr. McMurray and Dr. Shannon (Doc's 167, 173). Having reviewed the submissions of the parties and relevant law, and for the reasons set forth below, Defendants' motions for summary judgment shall be GRANTED.

## Background

In May, 2006, Daniel Garcia, a 33-year-old pretrial detainee, died from cardiac arrhythmia while in the custody of Bernalillo Metropolitan Detention Center (the "jail"). In the weeks leading up to his death, Daniel had several visits with the jail's medical staff. In April 2006, he visited a nurse and complained of heartburn (Doc. 167-2, Hurowitz Depo., 32:22 - 33:16). Under Dr. Shannon's supervision,[1] the nurse successfully treated Daniel with Maalox

---

[1] Although Dr. Shannon's role is in dispute, for the purposes of summary judgment, the Court will defer to Plaintiffs' version of the facts (*see* Doc. 129 at 11).

(*id.*). On May 16, Daniel saw a nurse regarding swollen ankles, and was told to return the next day so he could be seen by a doctor (Doc. 109, Amended Compl. ¶ 45). The next day, Daniel was seen by Defendant Dr. McMurray, who prescribed a diuretic, ran several tests, and told Daniel to return for a follow-up in one week (*id.* ¶ 46). Dr. McMurray noted that Daniel had no chest pain, no shortness of breath, and felt "normal" except for the "discomfort" caused by the swelling in his legs (Doc. 167-1, Medical Encounter Record, p. 1). Five days later, on May 22, Daniel returned to Dr. McMurray because his legs were still swollen (Doc. 109, Amended Compl. ¶ 50). Dr. McMurray increased the diuretic dosage, added an antibiotic, and suggested a follow-up in three days (*id.* ¶ 51). On May 24, Daniel's ankles were still swollen, so Dr. McMurray again increased the diuretic, and ordered a follow-up in two days (*id.* ¶ 52-53). The next day, Daniel died in his cell (*id.* ¶ 55). An autopsy revealed he likely died of cardiac arrhythmia (Doc. 71-4, Autopsy Rep., p. 1), which was probably related to his swollen ankles (Doc. 167-3, Hurowitz Rep., p. 2).

Daniel's family has brought this suit, alleging that deficiencies in Daniel's medical care amount to medical negligence under New Mexico tort law, and violations of the federal Constitution (Doc. 109, Amended Compl. pp. 11-13). At this juncture, it appears the only remaining defendants are Dr. Shannon and Dr. McMurray (collectively, "Doctors") (Doc's 109, Amended Complaint; 129, Memorandum Opinion Granting in Part and Denying in Part Summary Judgment). Plaintiffs assert that the heartburn and prolonged swelling of Daniel's ankles should have prompted the Doctors to investigate further, which could have revealed Daniel's arrhythmia before it became fatal. The Doctors move for summary judgment, arguing that Plaintiffs have failed to show the causation element necessary to their claims. For the reasons discussed below, summary judgment is appropriate.

**Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986). To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

**Discussion**

Jail officials render cruel and unusual punishment, in violation of the United States Constitution, when they evince "deliberate indifference" to the serious medical needs of a pretrial detainee. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994) (pretrial detainees receive full Eighth Amendment protections through the Due Process Clause, and the constitutional analysis does not change). Deliberate indifference to medical needs is a higher standard than medical negligence. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). Thus if a plaintiff fails to establish medical negligence, he necessarily fails to establish deliberate indifference to medical needs. *Giron v. Corrections*

*Corp. of Am.*, 191 F.3d 1281, 1286 (10th Cir. 1999). Because the Court finds that Plaintiffs here have failed to raise an inference of medical negligence, Plaintiffs likewise cannot succeed on their claim of deliberate indifference.

I. Causation is Necessary to Establish Medical Negligence

To withstand summary judgment on their medical negligence theory of a "lost chance," Plaintiffs must raise an inference that the Doctors' conduct breached the standards of medical care, proximately causing Daniel to reduce his odds of survival. *Alberts v. Schultz*, 975 P.2d 1279, 1284 (N.M. 1999). Even at the summary judgment stage, proximate cause cannot be inferred simply because a doctor provided negligent care, and some harm occurred. *Cervantes v. Forbis*, 389 P.2d 210, 213 (N.M. 1964). To proceed, "[t]here must be proof of a causal link between the negligence and the lost chance." *Alberts*, 975 P.2d at 1286; *see also Eck*, 256 F.3d at 1016-17 (to withstand summary judgment, a plaintiff must raise at least an inference for each element of his claim).

The plaintiff's burden is to "show to a reasonable degree of medical probability that the defendant's negligence caused the loss of the chance of a better result." *Alberts*, 975 P.2d at 1286. New Mexico courts have repeatedly emphasized that causation must be established as a probability, not merely a possibility. *Id.*; *Buchanan v. Downing*, 394 P.2d 269, 271-72 (N.M. 1964); *Baca v. Baca*, 472 P.2d 997, 1003 (N.M. App. 1970) ("[e]vidence which would support a mere possibility of [the patient's] recovery is not sufficient").

In virtually every medical negligence case, including this one, causation can only be inferred through expert testimony, because the facts do not lie within the common knowledge of laymen. *Alberts,* 975 P.2d at 1284; *Eis v. Chesnut*, 96 N.M. 45, 47 (N.M. App. 1981) ("absent

some glaring error such as inadvertently leaving a surgical instrument inside a patient, a plaintiff must offer expert testimony to defeat a defendant's motion for summary judgment"). Significantly, the expert must show that a better result would have been probable for this *particular* patient. *Alberts*, 975 P.2d at 1288 (expert conclusions "cannot be substantiated by conjecture, surmise, or speculation").

In sum, to establish causation, expert testimony must show that with proper care, Daniel probably would have had a better chance of survival.

## II. CAUSATION WAS NOT ESTABLISHED IN THIS CASE

Plaintiffs' expert, Dr. Hurowitz, has set forth his opinions in an expert report and deposition testimony (Doc's 167-3, 167-2, 178-1). He extensively discusses ways the Doctors could have investigated Daniel's condition before it became fatal: evaluate Daniel's electrolytes (Doc. 167-2, Hurowitz Depo., 62: 10-11), order a chest x-ray (*id*. at 62:19-22), order an echocardiogram (Doc. 178-1, Hurowitz Depo., 59: 21-24), order an electrocardiogram (*id*. at 39: 13-21), send Daniel to the infirmary (*id*. at 59: 21-24), confer with a colleague (*id*. at 59: 21-24), and question Daniel about the heartburn that was cured with Maalox (Doc. 167-3, Hurowitz Rep., p.1). Dr. Hurowitz is not clear about which of these approaches are standard care, and which are discretionary. He instead generally concludes that the failure to do *any* of the above actions shows a negligent disregard for the risk of a heart problem (Doc. 178-1, Hurowitz Depo., 60: 21-22).

While the above opinions may indicate a breach of standard care, nowhere has Dr. Hurowitz opined directly on causation.[2] Plaintiffs instead contend that because the care was sub-standard, and because Daniel no longer has a chance to survive, the Court must infer causation. As explained above, this simply is not so. *See* discussion *infra* Part I. It is not enough that Dr. Hurowitz allege the Doctors should have "done something further" (Doc. 178-1, Hurowitz Depo., 60: 21-22). Nor is it enough to allege that "an important opportunity was lost" to investigate further (Doc. 167-3, Hurowtiz Rep., p. 1). Dr. Hurowitz must also show that further investigation would have measurably increased Daniel's chance of successful diagnosis and treatment. *See Baer*, 972 P.2d at 15 (to establish causation, a plaintiff must show that with proper care, the patient "would likely have been diagnosed earlier, and [he] would have had a measurably increased chance of survival").

Dr. Hurowitz never states that Daniel ever had a measurable chance of diagnosis or treatment. Nor does he even create a reasonable inference through relevant testimony. *Cf. Baca*, 472 P.2d at 1003-04 (delay in operation could be inferred as the cause of death, because the expert testified that the patient's brain damage was slow-developing, that the patient was not operated on until after the damage was extensive, and that patients who receive timely operations survive 90% of the time). Here, without a showing that Daniel ever had a chance of survival, the

---

[2] Defendants therefore move to preclude Dr. Hurowitz from testifying on causation at trial. They allege that contrary to Fed. R. Civ. P. 26, Dr. Hurowitz was not disclosed as a "causation expert" (Doc. 166 at 6-7). Because summary judgment will be granted, the Court need not address this motion. However, the Court notes that Plaintiffs have indeed failed to disclose Dr. Hurowitz's causation opinions, thereby depriving Defendants of the opportunity to challenge such opinions at deposition, or provide a rebuttal witness. *See Woodworker's Supply, Inc. v. Principal Mut. Life. Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999) (when deciding the effect of a failure to disclose under Rule 26, a court should consider prejudice to the opposing party, the ability of the party to cure that prejudice, disruption to trial, and the violator's motives).

Court cannot infer that such a chance was lost. *Alberts*, 975 P.2d at 1282 (a plaintiff must show that "where there was once a chance of a better result, now there is a lesser or no chance").

A. Dr. Hurowitz's Testimony Reveals No Probability of Diagnosis

In *Baer v. Regents of the Univ. of Cal.*, expert testimony showed that a doctor was negligent in failing to administer an x-ray, and one year later, a belated x-ray revealed cancer already too developed to cure. 972 P.2d at 10. However, even this was insufficient to raise an inference of causation. *Id.* Without expert testimony, the fact-finder could not know if the cancer was detectable sooner, nor if a timely x-ray "would likely have revealed the presence of the cancer that was diagnosed too late." *Id.* at 15. Under *Baer*, the plaintiff must show that proper care would have likely lead to a diagnosis for that particular patient.

This case, like *Baer*, lacks any evidence suggesting that a timely diagnosis would have been likely. Dr. Hurowitz surmises that in general practice, certain tests may reveal certain symptoms of heart problems, but he does not say that Daniel likely exhibited any such symptoms. Essentially, Dr. Hurowitz has testified that one can only imagine what further testing might have revealed.

First, Dr. Hurowtiz says electrolyte evaluations can reveal low potassium levels, which may have triggered Daniel's arrhythmia (Doc. 178-1, Hurowitz Depo., 52:1-3). However, Dr. Hurowitz goes on to say that "we don't know" if Daniel actually had low potassium, and he "can't answer" whether it was probable (*id*. at 57:8-12). This does not show a probability of diagnosis. *See Alberts*, 975 P.2d at 1286 ("we emphasize that the standard in New Mexico is proof to a reasonable degree of medical probability," not possibility). More, Daniel's autopsy report says the arrhythmia was likely not caused by low potassium (Doc. 178-3, Autopsy Rep., p.

7

2). The report says Daniel's fatal arrhythmia was instead caused by clogged arteries, and there is no evidence that low potassium was a more likely cause (*id.*). *See Buchanan*, 394 P.2d at 271 (causation cannot be inferred "if the circumstances shown indicate an equal probability that [the harm] was due to some other cause").³ Thus while it remains possible that an electrolyte evaluation could have helped Daniel, it is well shy of being probable.

Second, Dr. Hurowitz says that in general, chest x-rays may reveal an enlarged heart or congested lungs (Doc.178-1, Hurowitz Depo., 58:15-20). However, Dr. Hurowitz immediately continues that Daniel did not have an enlarged heart (*id*. at 58:22-24). There is also nothing in the record to suggest that Daniel had lung congestion while he was alive. Daniel's autopsy revealed congested lungs, but the only evidence in record shows that this occurred as part of the "terminal event," and not while Daniel was alive (Doc. 167-7, Molk Rep., p. 2). Plaintiffs submit no argument or evidence to suggest otherwise. Thus it cannot be inferred that a chest x-ray would have likely increased Daniel's odds of survival. *See Cervantes*, 389 P.2d at 212 (when the party moving for summary judgment has shown "the absence of a fact issue, but there is available additional proof to the contrary, it is the duty of the party moved against to so apprise the court. He cannot stand silent, but must show its presence").

---

³ While the clogged arteries had at least an equal probability of leading to Daniel's death, Dr. Hurowitz never suggests that they could have been discovered through proper care. All the record reveals on this topic is that clogged arteries *cannot* be detected with a chest x-ray (Doc. 178-1, Hurowitz Depo. 59: 8-13). Dr. Hurowitz's testimony reads:
    Q. Is there any way you would have been able to see in the x-ray atherosclerosis?
    A. Not on a conventional x-ray, no.
    Q. So it wouldn't have tipped you off to the coronary artery disease?
    A. That's correct.

8

Third, Dr. Hurowitz recommends an echocardiogram. He says that in general, this test can reveal decreased ejection fractions and changes in the heart's chambers (Doc. 178-1, Hurowitz Depo., 60:1-11). Again, there is nothing in the record to suggest that Daniel had such symptoms while he was alive. Thus it once again cannot be inferred that these tests would have likely helped Daniel.

Finally, while Dr. Hurowitz lists several other options the Doctors could have pursued (issuing an electrocardiogram, submitting Daniel to the infirmary, conferring with a colleague, and questioning Daniel about his heartburn), Dr. Hurowitz does not say what symptoms these pursuits could have revealed - neither in general practice, nor in Daniel's specific case.

Dr. Hurowitz agrees it is "certainly possible" that Daniel exhibited absolutely no symptoms prior to his death (Doc. 167-2, Hurowitz Depo., 63: 9-12). Plaintiffs have failed to raise the inference that Daniel likely exhibited symptoms while he was alive, or that a diagnosis could have been reached with proper care. This is insufficient to withstand summary judgment.

B. Dr. Hurowitz's Testimony Reveals No Probability of Treatment

"A claim of loss of chance is predicated upon the negligent denial by a healthcare provider of the most effective therapy." *Alberts*, 975 P.2d at 1282. Thus even when an accurate diagnosis is possible, a plaintiff still has the burden to show that diagnosis could lead to beneficial treatment. *Alberts*, 975 P.2d at 1281. In *Alberts v. Schultz*, the expert identified a commonly-used and often-effective treatment for the patient's condition, which was denied to that patient due to the doctors' negligence. *Id.* However, causation could not be inferred because the expert failed to show that the patient was a suitable candidate for that treatment, or that the treatment would have likely been effective in that case. *Id.*; *see also, e.g., Zia Trust, Inc. v. Aragon*, 258

P.3d 1146, 1152 (N.M. App. 2011) (causation not inferred from a delay in treatment, because the expert could not say that timely treatment would have likely provided a better chance of survival); *Waconda v. United States*, 2007 U.S. Dist. LEXIS 55656, at *13 (D.N.M. May 30, 2007) (based on the same principle, causation not inferred from improper treatment).

In this case, Plaintiffs submit even less evidence than was provided in *Alberts*. Here, Plaintiffs do not provide even generalized conjectures of any known treatment for Daniel's condition. While it certainly seems possible that treatment exists, it is not for this Court or a jury to speculate that one does; nor that Daniel was medically eligible for treatment; nor that treatment had a probability of assisting Daniel in the time given. Even when it seems obvious that better medical care is available, "there may be a perfectly good answer [why it is not], and it is not for us or a jury to speculate concerning such matters." *Cervantes*, 389 P.2d at 213. It cannot be inferred that Daniel was denied treatment, and therefore it cannot be inferred that such a denial caused Daniel harm.

## Conclusion

Plaintiffs have failed to submit expert testimony suggesting that absent the Doctors' negligence, Daniel's arrhythmia probably would have been diagnosed and treated, and Daniel would have had a better chance of survival. Therefore, summary judgment is appropriate for Defendants Dr. Shannon and Dr. McMurray.

BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE